Robert S. Green (SBN 136183)
Elizabeth C. Guarnieri (SBN 208733)
**GREEN WELLING LLP**
595 Market St., Suite 2750
San Francisco, CA  94105
Telephone: (415) 477-6700
Facsimile:  (415) 477-6710
cand.uscourts@classcounsel.com

William B. Federman (SBN 2853)
**FEDERMAN & SHERWOOD**
120 N. Robinson, Suite 2720
Oklahoma City, OK  73102
Telephone: (405) 235-1560/
Facsimile: (405) 239-2112
wfederman@aol.com

*Attorneys for Plaintiffs*

ORIGINAL
FILED

AUG 1 4 2006

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-Filing

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**San Jose Division**

| | |
|---|---|
| LEO J. BIERMANN, Derivatively on Behalf of FOXHOLLOW TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> TOMOAKI HINOHARA, RYAN D. DRANT, JEFFREY B. CHILD, JOHN B. SIMPSON, SANFORD FITCH AND MYRTLE S. POTTER <br><br> Defendants, <br><br> and <br><br> FOXHOLLOW TECHNOLOGIES, INC., <br><br> Nominal Defendant. | Case No. C 06 4908 JW RS <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, UNJUST ENRICHMENT, AND GROSS MISMANAGEMENT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff, by his attorneys, submits this Verified Derivative Complaint (the "Complaint") against the Defendants named herein.

## NATURE OF THE ACTION

1.    This is a shareholder's derivative action brought for the benefit of Nominal Defendant FoxHollow Technologies, Inc. ("FoxHollow" or the "Company") against certain current and former members of its Board of Directors (the "Board") for violations of their fiduciary duties owed to FoxHollow from May 13, 2005 through the present (the "Relevant Period").[1]

2.    The claims asserted herein arise under state law for breach of fiduciary duty, unjust enrichment, gross mismanagement, and corporate waste.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).   This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

4.    Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the Defendants either resides in or maintains executive offices in this

_____

[1] Because Defendants have failed to take action to remedy the breaches of fiduciary duties that occurred between May 13, 2005 and January 26, 2006, the Relevant Period continues through this day instead of ceasing on January 26, 2006, the day before the public became aware of the wrongdoings at the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, UNJUST ENRICHMENT, AND GROSS MISMANAGEMENT          1

district, and Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## BACKGROUND

5.      FoxHollow was founded by Defendant John Simpson ("Simpson") in 1996.  The Company is based in Redwood City, California.  FoxHollow's sole product is a medical device called the SilverHawk, used to treat peripheral artery disease or PAD.  The catheter device is like a Roto-Rooter.  It is inserted inside a clogged artery, and a spinning blade within the catheter is switched on to cut through and remove plaque.

6.      In 2006, at the same time Simpson formed FoxHollow, he formed another company called Lumend, Inc.  Lumend is also based in Redwood City.  It has one primary product, called the Frontrunner, which is a catheter device inserted into an artery to penetrate plaque blockages and treat PAD.  However, unlike the FoxHollow's device, Lumen's device does not remove the plaque, but merely creates an opening for other treatments to then be used.

7.      Simpson, who had successfully formed other medical device companies and sold them for millions of dollars, spent several years trying to gauge the respective businesses of FoxHollow and Lumend, with contrasting results.  Ultimately, given the superiority of the FoxHollow technology and market interest, Simpson decided to only take FoxHollow public.

8.      In October 2004, FoxHollow commenced an initial public offering at $14 per share.  Overnight, Simpson's founders' stock – like that of his friends, family and medical colleagues who also invested pre-IPO – was worth millions.

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, UNJUST ENRICHMENT, AND GROSS MISMANAGEMENT                    2

Over the next year, as FoxHollow reported record revenues on a quarterly basis, and landed the role of its senior management team in the Company's continuing success, its stock price more than tripled in value, surpassing $50 per share by July 2005.   It continued to trade between $45 and $55 for months thereafter, amidst continuing positive reports about the Company's award-winning senior staff.

9.      Unfortunately, Simpson was not content with the singular success of FoxHollow.  In 2005, Simpson, while serving as Chairman of the Board and a paid "consultant" to the Company, ordered FoxHollow's senior management to use the Company's assets to acquire Lumend.   The acquisition made no sense, involved inferior technology, and was designed solely to benefit Simpson and his friends and family.   Accordingly, certain members of FoxHollow's senior management balked at the deal, despite threats from Simpson and his allies on the Board that they would be replaced if they refused to go along with Simpson's edict.  This material information was concealed from the public.

10.      Simpson, who was forced to sell Lumend at a lower price, then carried out his threat and purged FoxHollow of its "disloyal" management.   The news was devastating to FoxHollow and its shareholders.  After trading closed on Monday, December 12, 2005, while the Company was reporting record sales and revenues, and without any prior notice of discontent with management, FoxHollow announced that its Board had decided to make a "change" in management and replace Robert Thomas, the Company's President and CEO, with Simpson just two weeks later, on January 1, 2006.  FoxHollow's share price fell from $46.12 to $38.97 the next trading day on ten times ordinary volume.   Within one week,

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY,
CORPORATE WASTE, UNJUST ENRICHMENT, AND GROSS MISMANAGEMENT                    3

FoxHollow was trading below $31 per share, a loss of *one-third* of its market capitalization or over ***$375 million***.

11.     Without warning, after the close of trading on January 25, 2006, FoxHollow announced that David Martin, the Chief Operating Officer, and William Hoffman, the Vice President of Sales, were also going to be replaced.   FoxHollow reported that Duke Rohlen, Simpson's son-in-law, who had no prior public management experience, had been promoted to President of Strategic Operations and Matt Ferguson, Rohlen's brother-in-law, was remaining as CFO.   Over the next three days, FoxHollow's share price fell from $27.34 to a low of $23.35, another 15% loss.

12.     Together, after disclosure of the management purge, the Company's stock lost 50% of its value in just over one month.   The total market value loss is estimated at over ***$600 million***.

## PARTIES

13.     Plaintiff Leo J. Biermann is, and was at all relevant times, a shareholder of Nominal Defendant FoxHollow and is a citizen of Missouri.

14.     Defendant FoxHollow Technologies, Inc. is a corporation organized under the laws of Delaware, with principal executive offices at 740 Bay Road, Redwood City, California.

15.     Defendant Tomoaki Hinohara ("Hinohara") has served as a Director since 1997.   Hinohara is also a member of the Company's Compensation and Nominating and Governance Committee.  Based on her knowledge of material non-public information regarding the Company, Defendant Hinohara sold approximately 85,164 shares (almost all of her holdings) of FoxHollow stock for proceeds of almost

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY,
CORPORATE WASTE, UNJUST ENRICHMENT, AND GROSS MISMANAGEMENT                    4

$3,000,000.00 during the Relevant Period.  Upon information and belief, Hinohara is a citizen of California.

16.    Defendant Ryan D. Drant ("Drant") has served as a Director from 1998 until his resignation on June 28, 2006.  During that time, Drant served on the Company's Compensation Committee, Audit Committee and Nominating and Governance Committee.    Upon information and belief, Drant is a citizen of California.

17.    Defendant Jeffrey B. Child ("Child") has served as a Director since 2005.  Child is also a member of the Company's Compensation Committee and Audit Committee.  Upon information and belief, Child is a citizen of California.

18.    Defendant John B. Simpson ("Simpson") founded FoxHollow and has served as a Director of since its inception in 1996.  From October 1996 to July 1997, Simpson served as President of FoxHollow.  From May 2004 to December 2005, Simpson served as President of FoxHollow.  From May 2004 to December 2005, Simpson served as a paid consultant to FoxHollow.  From January 2005 to June 5, 2006, Simpson served as the Interim CEO and then became the permanent CEO.  Simpson, along with his family members and related trust, companies, and venture capital funds, is a large and controlling shareholder of FoxHollow.    Based on his knowledge of material non-public information regarding the Company, Defendant Simpson sold approximately 400,411 shares (approximately 10% of his holdings) of FoxHollow stock for proceeds of approximately $15,000,000.00 during the Relevant Period.  Upon information and belief, Simpson is a citizen of California.

19.     Defendant Sanford Fitch ("Fitch") has served as a Director since 2004.  Fitch also serves on the Company's Audit Committee and Nominating and Governance Committee.   Upon information and belief, Fitch is a citizen of California.

20.     Defendant Myrtle S. Potter ("Potter") has served as a director of FoxHollow since 2005.  Potter was appointed as a member of the Company's Audit Committee to replace Defendant Drant upon his resignation on June 28, 2006.  Upon information and belief, Potter is a citizen of California.

21.     Collectively, the Defendants are referred to herein as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of FoxHollow's quarterly and annual reports and other SEC filings, press releases, presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of these Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed form the public and that the positive representations which were being made were then materially false and misleading.   The Individual Defendants are liable for the concealments and statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

22.   By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

23.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their positions with FoxHollow, each of the Defendants were aware of these wrongful acts, had access to adverse non-public information and was required to disclose these facts promptly and accurately to FoxHollow shareholders and the financial markets but failed to do so.

24.   To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such

duties, the officers and directors of the Company were required to, among other things:

    a.    exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.    exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

    c.    exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company; and

    d.    exercise good faith in ensuring  that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and

    e.    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

    25.    The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.   According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.   Among other things, the Individual Defendants were required to:

    (1)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(a)    transactions are executed in accordance with management's general or specific authorization;

(b)    transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

26.    FoxHollow's Audit Committee Charter provides that the Audit Committee shall, among other things,

a.    Review the company's Forms 10-Q, 10-K, and where appropriate, registration statements under the Securities Act of 1933 prior to filing with the SEC and discuss with management and the independent auditors; and

b.    Review the company's quarterly and annual financial statements, including any report or opinion by the independent auditors, prior to distribution to the public or filing with the SEC.

## FACTUAL ALLEGATIONS

**A.    1996: Simpson Forms FoxHollow and Lumend**

27.    In 1996, Simpson formed FoxHollow to market a device used to treat peripheral artery disease or PAD.   The device is called the SilverHawk and collects and removes plaque in order to reopen narrowed or blocked arteries.

28.    Similarly, in 1996, at the same time he was forming FoxHollow, Simpson formed another private company called Lumend, along with Matthew Selmon.   For years, Selmon has been Simpson's medical partner at a private cardiology practice in Redwood City, near Sequoia Hospital.  Similar to FoxHollow, Lumend's primary product was called the Frontrunner, which is a catheter used by physicians to penetrate and "cross" an occlusion or blockage in the artery.  Unlike the SilverHawk, the Frontrunner simply crosses the blockage so that other

treatments, such as angioplasty or stents, can be used to treat the problem. The Frontrunner does not actually remove the plaque.

29.     Lumend has other similarities with FoxHollow. Tomoaki Hinohara, who also practices with Simpson and Selmon in Redwood City, helped to invent and develop the Lumend technology and is listed as a co-inventor on several patents issued to or patent applications made by Lumend. At the same time, Hinohara served as a director at FoxHollow.

30.     Before its IPO, FoxHollow was financially backed by Simpson, through his affiliated venture capital firm called De Novo Ventures. De Novo, which is based in Menlo Park, also was one of the primary investors in Lumend. De Novo was co-founded in 2000 by Simpson and Richard Ferrari. Ferrari also served on FoxHollow's Board of Directors until 2005.

31.     Douglas S. Rohlen or "Duke" Rohlen is Simpson's son-in-law and the brother-in-law of Ferguson, FoxHollow's CFO. Neither Rohlen nor Ferguson had served as an officer or director of a public company. Before joining FoxHollow, Rohlen worked as the Director of Business Development at Lumend for this father-in-law.

32.     Unlike FoxHollow's SilverHawk technology, Lumend was a market failure and failed to make significant inroads into the PAD treatment market. Its Frontrunner device was also inferior to other treatment alternatives available to physicians, including the SilverHawk.

33.     Accordingly, after receiving clearance from the FDA to market the SilverHawk, Simpson devoted his efforts to FoxHollow's business. Between 2003 and 2004, Simpson directed management to build a direct sales force organization

and initiate sales to medical centers.  With the efforts of Robert Thomas, CEO, David Martin, COO, and William Hoffman, Vice President of Sales Thomas, FoxHollow then introduced its product to the United States, with significant success.  By September 2004, FoxHollow had 217 employees and had just completed a move into a 61,000 square foot facility in Redwood City.

**B.    2004: Simpson Take FoxHollow Public**

34.    In September 2004, FoxHollow commenced filings with the SEC to take the Company public.

35.    At the time, the Company's senior management included Thomas, CEO, Matt Ferguson, CFO, Martin, COO, and Hoffman, Vice President of Sales. The Company's Board included Simpson, Hinohara, Ferrari, Thomas, Ryan Drant and Sanford Fitch.  In addition, in May 2004, FoxHollow and Simpson entered into a consulting agreement whereby Simpson was paid $25,000 per month to provide consulting services.

36.    On or about October 28, 2004, FoxHollow filed its Registration Statement and Prospectus to initiate its initial public offering.  FoxHollow offered 4.5 million shares of its common stock at an initial price of $14.00 per share.  At the time, according to the Prospectus, De Novo held 2,075,173 shares and 32,451 options and warrants, representing 12% of the Company before the IPO and 9.5% after the IPO.  Simpson held 7,814,693 shares and 117,061 options and warrants, representing 44.8% before the IPO and 35.7% after the IPO.

37.    On December 6, 2004, FoxHollow filed with the SEC its Form 10-Q for the third quarter ending September 30, 2004.  The Company announced that net revenues were $11.6 million for the first three months ended September 30,

---

2004 compared to $650,000 for the three months ended September 30, 2003. The Company announced that net revenues were $23.9 million for the nine months ended September 30, 2003.   The Company disclosed that its IPO completed on October 28, 2004 had sold 4.5 million shares at $14.00 per share, and on October 29, 2004 the underwriters had exercised their over-allotment option to purchase 675,000 shares at $14.00 per share.   Proceeds from the offering were about $67.4 million.

38.   On February 14, 2005, FoxHollow filed with SEC its Form 8-K, and issued a related press release, announcing its fourth quarter 2004 and year end results.   The Company announced that its fourth quarter revenues were $14.7 million, a 27% increase over the $11.6 million reported for third quarter of 2003. For the full year, FoxHollow reported net revenues of $38.6 million, compared to $2.6 million for 2003.

39.   On March 28, 2005, FoxHollow filed with the SEC its Form 10-K, reiterating these financial results.   The Company also disclosed that, as of December 31, 2004, it had increased its staff to 244 employees, noting that "We believe that our future success will depend on our continued ability to attract, hire and retain qualified personnel."   The Company also disclosed that the Board's Compensation Committee had increased the salary of Thomas, its CEO, from $275,000 to $300,000, and the salary of Martin, its COO, from $175,000 to $225,000, and in addition, approved a bonus plan whereby these executives would be eligible for cash bonuses in the event certain key performance targets were met or exceeded.

40.   On April 8, 2005, FoxHollow issued a press release announcing that lock-up agreements entered into in conjunction with the IPO would be extended 19 days, or until May 13, 2005, and the first sales of restricted shares could take place on May 16, 2005.  The lock-up period had been due to expire on April 26, 2005, based on the planned timing of FoxHollow's quarterly earnings release. However, the release was delayed until April 17, 2005.  The extension affected about 17.7 million shares of stock, much of it owned by the Individual Defendants or their affiliates.

41.   On April 27, 2005, FoxHollow filed with the SEC its Form 8-K, and issued a related press release, announcing its financial results for the first quarter of 2005 ended March 31, 2005. The Company announced that its revenue was $21.5 million, which was a 46% increase over revenue of $14.7 million in the fourth quarter of 2004 and a 350% increase over first quarter 2004 revenue of $4.8 million. The Company reported a gross margin of 59% for the first quarter of 2005 versus 52% in the fourth quarter of 2004 and 14% in the first quarter of 2004. Net loss for the quarter was $6.5 million, compared with a net loss of $7.5 million in the fourth quarter of 2004. Robert Thomas stated, "These results reflect FoxHollow's success in developing and penetrating the market for treating PAD and our ability to grow our sales force and manufacturing capacity, as well as the compelling patient outcomes achieved with our device." Thomas also noted that FoxHollow ended the quarter with 89 direct salespeople, compared with 69 in the fourth quarter of 2004, and was on track to have about 125 sales professionals by the end of 2005.

42.     On April 29, 2005, FoxHollow filed with the SEC its Schedule 14A Proxy Statement, giving notice of its 2005 annual meeting to the held on June 16, 2005.   The Proxy also included a summary compensation table for FoxHollow's senior executives in 2003 and 2004, indicating that Thomas, Martin and Hoffman all received raises in 2004, along with cash bonuses and long term stock option awards. In the Compensation Committee's report, it noted that Thomas' salary for 2004 was based on Thomas' qualifications, knowledge and experience and his individual performance at FoxHollow.

## C.   2005-2006:  The False and Misleading Statements

43.     On May 13, 2005, FoxHollow filed with the SEC its Form 10-Q for the first quarter of 2005, signed by Ferguson. FoxHollow reported its financial results for the first quarter, including record quarterly revenues. Notably, within the litany of "Factors Affecting Future Operating Results" listed by FoxHollow in its 10-Q, and repeated in all future l0-Qs filed with the SEC during the Relevant Period, were the following:

> "We depend on skilled and experienced personnel to operate our business effectively. If we are unable to recruit, hire and retain these employees, our ability to manage and expand our business will be harmed, which would impair our future revenue and profitability.
>
> Our success largely depends on the skills, experience and efforts of our officers and other key employees. Any of our officers and other key employees may terminate their employment at any time. The loss of any of our senior management team could harm our business. Our ability to retain our skilled labor force and our success in attracting and hiring new skilled employees will be a critical factor in determining whether we will be successful in the future. We may not be able to meet our future hiring needs or retain existing personnel. We will face particularly significant challenges and risks in hiring, training, managing and retaining engineering and sales and marketing employees. Failure to attract and retain personnel, particularly technical and sales and marketing personnel, would harm our ability to compete effectively and

grow our business. The announcement of the loss of one of our key employees could negatively affect our stock price.

"If we make acquisitions or divestitures, we could encounter difficulties that harm our business.

We may acquire companies, products or technologies that we believe to be complementary to the present or future direction of our business. If we engage in such acquisitions, we may have difficulty integrating the acquired personnel, financials, operations, products or technologies. Acquisitions may dilute our earnings per share, disrupt our ongoing business, distract our management and employees and increase our expenses, which could harm our business. If we use our common stock to acquire companies, products or technologies, it may substantially dilute the percentage of the company held by stockholders who own securities prior to the acquisition."

44.     These same disclosures were made in other filings made during the Relevant Period. FoxHollow readily acknowledged the material aspects of these specific risks - loss of key management and devotion of resources to acquisitions - to the Company's viability, operations, financial performance and stock price. As key risks to FoxHollow, all material information to these risks should have been disclosed to the public.

45.     On May 18, 2005, Thomas, FoxHollow's CEO, was given the top award - the ABBY - at the Seventh Annual Innovations in Healthcare event and awards ceremony in Orange, California. The award was presented by the Adaptive Business Leaders Organization, comprised of CEOs and Presidents of healthcare and technology firms in the United States. A news release of the award, published on PRNewswire on May 19, 2005, stated that Thomas was recognized for his work at FoxHollow, including $40 million in revenues and going public over 2 the past months.

46.     During the ten-day trading period, between May 16, 2005 and May 26, 2005, FoxHollow's share price climbed form about $30 per share to $40 per share on heavy volume.

47.     On June 20, 2005, FoxHollow filed with the SEC a Form 8-K and issued a press release announcing that Defendant Jeffrey Child was appointed to the Board of Directors to fill a vacancy created by Richard Ferrari, who resigned on June 17, 2005. FoxHollow did not disclose that Child was a close friend and neighbor of Ferguson.

48.     On July 27, 2005, FoxHollow filed with the SEC a Form 8-K and issued a press release announcing its financial results for the second quarter of fiscal year 2005 ended June 30, 2005, including revenue for the quarter of $28.7 million, a 33% increase over revenues of $21.5 million in the first quarter of 2005, and a 283% increase over revenues of $7.5 million in the second quarter of 2004. The Company also reported a gross margin of 69% in the second quarter, versus 59% in the first quarter of 2005 and 19% in the second quarter of 2004. The net loss for the quarter was $3.4 million compared to a net loss of $6.5 million in the first quarter of 2005 and a net loss of $8.8 million in the second quarter of 2004.

49.     On July 28, 2005, FoxHollow's stock price soared about 18% to an all time high trading price of $55.20.  The trading volume was almost 5 million shares, more than ten times ordinary volume, and the largest single trading day in the Company's history (other than its IPO).

50.     On July 28, 2005, FoxHollow filed with the SEC its Form 10-Q for the second quarter of 2005, signed by Ferguson.  FoxHollow reported its financial results for the second quarter, including record quarterly revenues.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, UNJUST ENRICHMENT, AND GROSS MISMANAGEMENT                    16

51.     On October 26, 2005, FoxHollow filed with the SEC a Form 8-K, and issued a press release, announcing its financial results for the third quarter of fiscal year 2005 ended September 30, 2005. The Company's reported revenue for the third quarter was $36.1 million, a 26% increase over revenue of $28.7 million in the second quarter of 2005 and a 212% increase over revenue of $11.6 million in the third quarter in 2004. The Company reported a gross margin of 73% versus 69% in the prior quarter and 40% in the third quarter of 2004. Net loss for the quarter was $1.5 million, compared to a net loss of $3.4 million in the second quarter of 2005 and a net loss of $7.4 million in the third quarter of 2004. Excluding stock-based compensation expenses, FoxHollow actually reported net income for the first time. The Company also announced other significant accomplishments, including the agreement with Merck, promising treatment data presented at a trade meeting, the expansion of its manufacturing facility, and increased production capacity to meet future orders.

52.     On November 1, 2005, FoxHollow filed with the SEC its Form 10-Q for the third quarter of 2005, signed by Ferguson.  FoxHollow reported its financial result for the third quarter, including record quarterly revenues.

53.     On November 7, 2005, FoxHollow filed with the SEC its Form 8-K, and issued a press release, announcing a new lease for a 124,274 square foot facility. FoxHollow also announced that Myrtle Potter had been appointed to the FoxHollow Board.  FoxHollow did not disclose that Potter had just purchase her new home in Woodside from Duke Rohlen, Simpson's son-in-law.

54.     During the Relevant Period, the representations made by Defendants about FoxHollow,  its  business  and  operations,  the  performance  of  senior

management, and its future expectations, were false and misleading. As described below, they misrepresented and/or omitted the following adverse facts which then existed and disclosure of which was necessary to make the statements made not false and/or misleading.

55.    Specifically, at Simpson's direction, and with the Board's knowledge and concurrence, certain members of FoxHollow's senior management - including Thomas, Martin and Hoffman - had been ordered to complete the acquisition of Simpson's other private company, Lumend. Simpson also threatened Thomas that, in the event he did not acquire Lumend, he would be terminated as CEO, notwithstanding his years of successful service to the Company and its shareholders. Remarkably, while FoxHollow regularly reported that the loss of any of its senior management would negatively impact the Company and its share price, and that any acquisition, even one thought to be in the Company's best interests, could adversely impact the Company due to the costs and efforts imposed by the acquisition, defendants concealed both Simpson's edict and his threats of termination to the public.

56.    Senior management refused to go forward with the deal, since the acquisition did not make sense for FoxHollow, which already had a tested, market proven catheter product, and already had developed sales and marketing programs and trained employees based on its device's unique capabilities. Conversely, Lumend's device was an inferior technology, untested and unproven in the market. Lumend also did not have a fully capable infrastructure in place, and FoxHollow would have been forced to devote substantial resources to the untested device, even though it was premature and not commercially viable. Moreover, the cost of

acquiring Lumend was far above its market value, essentially constituting a gift to Simpson and affiliates who were investors in Lumend. Indeed, there was no rational business reason for acquiring Lumend other than to pay off Simpson.

**D.   FoxHollow Discloses the Management Purge and it Stock Plunges**

57.   After the close of trading on December 12, 2005, FoxHollow filed a Form 8-K with the SEC, and issued a press release entitled, "FoxHollow Technologies Announces Management Transition." While Simpson had essentially forced Thomas to depart FoxHollow due to the Lumend deal, the press release reported that Thomas had "informed the Company's Board of Directors that he will be retiring" as President and CEO and resigning from the Board effective January 1, 2006 - i.e., just two weeks later. FoxHollow also announced that Simpson would replace Thomas as "interim" CEO. Simpson stated, "I have maintained a very active role with the Company and look forward to leading our outstanding group of senior management until we have named a replacement. We will be looking for a permanent chief executive officer who has extensive leadership experience and who can lead the Company through its next stage of growth." Even this brief statement was misleading, since Simpson did not intend on leading its present senior management nor view them as "outstanding." To the contrary, Simpson planned to also fire Martin and Hoffman just a few weeks later. FoxHollow also announced that a "management leadership committee" had been formed, comprised of Ferguson, Martin, Ron Steckel, and Duke Rohlen.

58.   The news took the market by complete surprise during a period in which FoxHollow had been reporting market and financial successes, record revenues, a first time profit, expanding facilities, and hiring new personnel. On

December 13, 2005, FoxHollow's share price plunged from the prior day's close of $46.12 to $38.97, a 15.5% drop. The trading volume was massive, with over 4.5 million shares traded - the second largest trading day in the Company's history. In the next few days, on continued large trading volume, FoxHollow's stock price fell to about $30 per share or a one-third loss of market capitalization.

59.    After the news, TheStreet.com reported that Herb Greenberg of Marketwatch "believes there is more to the story" and "raised a red flag over the sudden retirement announcement of FoxHollow CEO Robert Thomas. Greenberg said Thomas is just 44 years old and `loved the company.'" According to AP reports, Piper Jaffray analyst Thomas Gunderson stated in a research report, "There is a strong feeling of another shoe to drop in this story."

60.    On January 9, 2006, FoxHollow filed with the SEC its Form 8-K, and issued a press release, announcing its preliminary financial results for the fourth quarter ended December 31, 2005 and the full fiscal year 2005, as well as to give guidance for the first quarter and full fiscal year of 2006. While the Form 8-K, signed by Ferguson, indicated that previously forecasted revenue for the fourth quarter and the full year 2004 remained on course, there was no mention of the management "transition." Instead, Simpson touted the results reached on Thomas' watch, stating "Our tremendous growth in 2005 and growth outlook for 2006 is based on our success in driving adoption for existing customers, as well as the significant increase of our customer base. Revenues for 2005 more than tripled from 2004. Our outlook for 2006 represents a more than 60 percent growth in year-over-year revenue."

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, UNJUST ENRICHMENT, AND GROSS MISMANAGEMENT                          20

61.     With respect to management of the Company, Simpson stated, "We have initiated a search for a new chief executive officer and have selected the firm of Spencer Stuart to assist us with that search. While looking forward to the completion of the search process, we are confident in the abilities of the senior management team already in place."

62.     Yet, just two weeks later, just as the market activity in FoxHollow's stock started from the sudden and unexpected departure of its CEO, a much different picture of senior management was revealed. On January 26, 2006, FoxHollow filed with the SEC its Form 8-K, signed by Ferguson, and issued a press release, announcing that David Martin was being replaced as Chief Operating Officer and William Hoffman was being replaced as Vice President of Sales. Duke Rohlen, Simpson's son-in-law, was promoted to President of Strategic Operations and Ferguson remained as CFO. Simpson explained, "Based on the new strategic initiatives we announced earlier this month, it is appropriate to effect this transition at this time." On the news, FoxHollow's share price fell 7% the next trading day and about 15% within three days, reaching a new yearly low of $23.35.

63.     Collectively, after public revelation of FoxHollow's management "transition," which was the end result of Simpson's undisclosed edict to Company management to acquire Lumend or else be terminated, shareholders lost 50% of their stock value in just over one month.  The total market value loss is estimated at over $600 million.

64.     Not surprisingly, FoxHollow's stock value has yet to recover from the revelation of this material information.  FoxHollow recently announced that Simpson was changing his title from the "interim" CEO to the permanent CEO.  Simpson

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, UNJUST ENRICHMENT, AND GROSS MISMANAGEMENT                21

attributes the Company's sales success to its "strong management team" – i.e., his son-in-law, Duke, and his brother-in-law Ferguson.  On the news that Simpson was remaining as CEO, the stock dropped more than 10%.

65.     During the Relevant Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated FoxHollow's stock price and operated as a fraud and deceit on purchasers of FoxHollow common stock.    Material information about Simpson's edict to Company management to acquire Lumend, and his decision to terminate senior management if and when they refused to follow the edict, was concealed.  When the result of such edict, the sudden and unexpected departure of the three highest ranking members of management, was disclosed and became apparent to the market, the price of FoxHollow stock fell precipitously on massive trading volume as the prior artificial inflation came out of FoxHollow's stock price.

66.     Further, during the Relevant Period and while in possession of material undisclosed information, Defendants Simpson and Hinohara's stock sales were extremely suspicious as to both the timing and amount sold.  The insider stock sales that occurred within the Relevant Period are set forth below:

Defendant Simpson:[2]

| Date | Shares Sold | Proceeds |
|---|---|---|
| 05/31/05 | 139,073 | $ 4,915,501.90 |
| 07/01/05 | 41,773 | $ 1,581,260.80 |
| 08/01/05 | 41,773 | $ 2,009,915.60 |
| 08/30/05 | 41,773 | $ 1,748,273.39 |
| 10/03/05 | 18,800 | $    799,449.00 |

---

[2] Includes shares sold the Simpson Family Trust, John Simpson Trustee.

| | | |
|---|---|---|
| 10/31/05 | 39,073 | $ 1,284,497.90 |
| 11/30/05 | 39,073 | $ 1,694,051.90 |
| 01/03/06 | 39,073 | $ 1,183,911.90 |
| **TOTAL:** | **400,411** | **$15,216,862.39** |

Defendant Hinohara:[3]

| Date | Shares Sold | Proceeds |
|---|---|---|
| 05/31/05 | 4,000 | $   146,000.00 |
| 07/01/05 | 40,164 | $1,161,540.00 |
| 08/30/05 | 1000 | $    44,540.00 |
| 10/03/05 | 4000 | $   186,960.00 |
| 10/31/05 | 12,000 | $   543,243.00 |
| 11/30/05 | 4,000 | $   171,400.00 |
| 01/03/06 | 4,000 | $   121,200.00 |
| 01/31/06 | 4000 | $    95,600.00 |
| 02/28/06 | 4000 | $   108,440.00 |
| 04/03/06 | 4000 | $   122,520.00 |
| 05/01/06 | 4000 | $   125,220.00 |
| **TOTAL:** | **85,164** | **$2,826,663.00** |

67.    On February 21, 2006, the Company announced its Fourth Quarter 2005 Revenues.  The press release stated in relevant part:

---

[3] Does not include shares owned Hinohara Associates, Inc., or Hinohara Trust.

## FOXHOLLOW TECHNOLOGIES REPORTS FOURTH QUARTER 2005
## REVENUES OF $41.9 MILLION; ANNUAL REVENUES MORE THAN TRIPLE TO $128.2 MILLION

(REDWOOD CITY, CA), February 21, 2006—FoxHollow Technologies, Inc. (NASDAQ: FOXH), which manufactures and markets the SilverHawk™ Plaque Excision System—a minimally invasive device for the treatment of peripheral artery disease (PAD)—today reported results for the fourth quarter and full year of fiscal 2005.

For the fourth quarter ended December 31, 2005, the company had revenues of $41.9 million, a 16 percent increase over revenues of $36.1 million in the third quarter of 2005 and 185 percent increase over revenues of $14.7 million in the fourth quarter of 2004.

FoxHollow reported a gross margin on product sales of 70 percent versus 73 percent in the prior quarter and 52 percent in the fourth quarter a year ago. The net loss for the fourth quarter of 2005 was $160,000, or $0.01 per share, compared with a net loss of $1.5 million, or $0.06 per share, in the third quarter of 2005, and a loss of $7.5 million, or $0.50 per share, in the fourth quarter a year ago. Included in these results are non-cash, stock-based compensation expenses of $1.2 million in the fourth quarter of 2005, $2.2 million in the third quarter of 2005 and $2.8 million in the fourth quarter of 2004. Net income excluding stock-based compensation expense was $1.1 million, or $0.05 per share, in the fourth quarter of 2005.

Net income excluding stock-based compensation expense is a non-GAAP financial measure. This measure provides an indication of FoxHollow's performance before certain charges that are considered by management to be outside of the company's core operating results. In addition, net income excluding stock-based compensation expense is among the primary indicators FoxHollow's management uses as a basis for planning and forecasting of future periods. The presentation of this additional information should not be considered in isolation or as a substitute for net income prepared in accordance with generally accepted accounting principles.

For the full year 2005, FoxHollow reported revenues of $128.2 million compared with revenues of $38.6 million in 2004. The company reported a net loss attributable to common stockholders of $11.6 million, or $0.51 per share, in 2005 versus a loss of $45.9 million, or $10.52 per share, in 2004.

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, UNJUST ENRICHMENT, AND GROSS MISMANAGEMENT            24

"FoxHollow ended 2005 in very solid fashion as it continued to drive broader adoption of the SilverHawk as an effective treatment for PAD," noted Dr. John Simpson, interim chief executive officer. "A key indicator of our success during the year is the 18 percent increase in the average number of devices purchased per hospital in Q4 2005 compared to the same quarter during the prior year. I am particularly pleased with this result considering that over the same period we saw an 81 percent increase in the number of active hospital accounts and a 26 percent increase in the average selling price of the SilverHawk," he continued.

68.    On or about August 2, 2006, the Company announces its second quarter revenue:

**FOXHOLLOW TECHNOLOGIES REPORTS SECOND QUARTER REVENUE INCREASES 68 PERCENT TO $48.2 MILLION**

**COMPANY ANNOUNCES FIRST PROFITABLE QUARTER**

REDWOOD    CITY,    Calif.,    August 2,    2006—FoxHollow Technologies, Inc. (Nasdaq: FOXH), which manufactures and markets the SilverHawk™ Plaque Excision Systems—a minimally invasive device for the treatment of peripheral artery disease (PAD)—today reported results for the second quarter and first half of fiscal 2006.

For the quarter ended June 30, 2006, the company reported revenue of $48.2 million, a 68 percent increase over revenue of $28.7 million in the same period a year ago. Revenue for the second quarter of 2006 included $48.0 million of product revenue and $216,000 of research collaboration revenue related to the company's partnership with Merck & Co., Inc. This compares with first quarter revenue of $44.6 million from product sales and $2.1 million in research collaboration revenue. As discussed previously, the company anticipated the decline in research collaboration revenue during the second quarter, related to the timing of patient enrollment in clinical studies.

FoxHollow reported net income of $532,000, or $0.02 per diluted share, which marks the company's first profitable quarter. The company reported a net loss of $3.4 million, or $0.15 per share, in the second quarter of 2005. Included in these results are non-cash, stock-based compensation expenses of $2.9 million, or $0.12 per share in the second quarter of 2006, and $1.9 million, or $0.08 per share, in the second quarter of 2005. Net income, excluding stock-based compensation, was $3.4 million, or $0.13 per diluted share, in the second quarter of 2006. The company reported a gross margin on product sales of 78 percent in the second quarter of 2006 versus 69

percent in the second quarter a year ago. A reconciliation of GAAP and non-GAAP operating results is provided below.

"This was a milestone quarter for FoxHollow for a number of reasons, including our first quarter of profitability on a GAAP basis. Our financial performance speaks to increased adoption of the SilverHawk and growing confidence in the medical community that plaque excision is a valuable and important addition to the treatment options for PAD," noted Dr. John Simpson, who was named chief executive officer during the second quarter.

"In addition, we realized important accomplishments in our product development programs. We have now launched the MiniHawk, a downsized version of the SilverHawk, which is designed to treat very small arteries in the lower leg and foot. These arteries can be hard to access with standard sized devices but are often very important for foot salvage, so I expect the MiniHawk to move us closer to our ultimate goal of minimizing amputations at all levels. I am also pleased to announce we have completed working prototypes of the NightHawk, a plaque excision system that includes intravascular imaging capabilities. We have used the NightHawk in experimental models with very good success and remain on track to use this product in patients by the end of the year," Dr. Simpson added.

In the second quarter, the company also initiated enrollment in its SWIFT study, which will provide third-party analysis of the six and twelve month outcomes data for a new 100 patient registry. The company also expects to begin patient enrollment in its PROOF trial during the fourth quarter. This study will randomize 400 patients with critical limb ischemia to either the SilverHawk or surgical bypass, which is currently considered the standard of care within the vascular surgery community. Patients will be followed for five years post-procedure, with the primary study endpoint being amputation-free survival. The study will also measure ten additional endpoints, such as limb salvage, quality of life, re-intervention rates and costs.

Regarding the company's biologics group and business development activities, Duke Rohlen, the company's president of strategic operations, commented, "Our collaboration with Merck continues to go very well. The early results from Merck's plaque analysis are consistent with what was predicted based on the biopsy experience in cancer tumors that dates back decades—that there is valuable information in the tissue taken from the diseased areas. We are hitting or exceeding our collective initial objectives and have received positive feedback from Merck on the value they are receiving from the collaboration. We also continue to have discussions regarding other potential biologics-related opportunities that do not conflict with our Merck collaboration, as well as several opportunities to acquire or license complementary device technologies."

For the first six months of 2006, FoxHollow reported revenue of $94.8 million versus revenue of $50.2 million in the same period a year ago. The company reported a net loss of $14.1 million, or $0.57 per share in the first six months of 2006, versus a net loss of $10.0 million, or $0.44 per share, in the same period a year ago. FoxHollow reported net income excluding stock-based compensation, of $3.6 million, or $0.14 per diluted share, in the first six months of 2006, versus a loss of $6.3 million, or $0.28 per share, in the first six months of 2005.

## DEMAND WOULD BE FUTILE

69.     The Defendant directors face a substantial likelihood of liability in this action because of the Company issued false and misleading statements concerning the Company's business practices, internal controls, and omitted material information regarding FoxHollow's falsified financial results.    The dramatic breakdowns and gaps in those controls were so widespread and systematic that the entire Board faces substantial exposure to liability, under the *Caremark* doctrine, for their total abrogation of their duty of oversight.   These directors either knew or should have known that violations of law were occurring and took no steps in a good faith effort to prevent or remedy that situation, proximately causing hundreds of millions of dollars of losses for the Company as the Company's common stock traded at artificially inflated levels.

70.     Plaintiff will adequately and fairly represent the interests of FoxHollow and its shareholders in enforcing and prosecuting its rights.

71.     Plaintiff has not made a demand on the Board to bring these causes of action because such a demand would be futile. At the time of filing this lawsuit, the members of the Board are Defendants Hinohara, Child, Simpson, Fitch and Potter.  As detailed below, each of the directors are subject to substantial liability on these derivative claims and are therefore in no position to render a disinterested

judgment on whether the Company should bring them, and/or lack sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

### Likelihood of Substantial Liability
### of the Audit Committee Defendants

72.     Defendant Directors Potter, Child and Fitch also had enhanced responsibilities as members of the Company's Audit Committee.  That Committee was charged with direct responsibility for the appointment, compensation and oversight of the work of the outside auditors; and the Audit Committee Charter imposed a detailed set of responsibilities and powers in connection with financial reporting and financial controls.

### Additional Likelihood of Substantial Liability of Other Board Members

73.     Defendant Directors Simpson and Potter are also exposed to substantial potential liability in this action because of their complete failure to put appropriate financial and legal compliance controls in place to assure the accuracy of financial information disclosed by the company to the public.

74.     In addition, Defendant Directors Hinohara and Child are members of the Company's Compensation Committee.  That Committee was charged with direct responsibility for the appointment, compensation and oversight of the work of the outside auditors; and the Audit Committee Charter imposed a detailed set of responsibilities and powers in connection with financial reporting and financial controls.   In those positions, they approved compensation plans for senior executives and directors, pursuant to which millions of dollars were paid out by the Company based on financial results that have now turned out to be grossly inflated.

### Each Director Defendant Lacks Independence

75.    Defendant Director Simpson, as the Company's current CEO, lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

76.    Defendant Directors Hinohara and Child are members of the Board's Compensation Committee, and so, as described above, lack the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

77.    Plaintiff has not made any demand on the shareholders of FoxHollow to institute this action since demand would be a futile and useless act for the following reasons:

    a.    FoxHollow is a publicly held company with approximately 24,916,717 shares outstanding, and thousands of shareholders;

    b.    Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

    c.    Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

78.    FoxHollow has expended and will continue to expand significant sums of money as a result of the illegal and improper actions described above.  Such expenditures will include, but are not limited to costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts and the costs and expenses related to the securities class actions filed against the company.

---

79.     Additionally, Derivative Plaintiff has not made a demand on the board of directors to bring these causes of action because such a demand would be futile and useless act for the following reasons:

a.     The Company entered into an agreement with JBS Consulting, LLC ("JBS Consulting") and an agreement with JBS Consulting and Defendant Simpson regarding the use of a private aircraft owned by JBS Consulting for company business. Defendant Simpson is the president and managing officer of JBS Consulting. Pursuant to these agreements, JBS Consulting will be reimbursed for the cost of airfare in connection with company business. Because of Defendant Simpson's inter-related business relationships, demand on Defendant Simpson is futile.

b.     Defendant Hinohara practices medicine with Defendant Simpson in Redwood City, CA. Defendant Hinohara helped develop the technology for Lumend, a private company formed by Defendant Simpson. Defendant Hinohara is listed as a co-inventor on several patents issued to or patent applications made by Lumend. During their several years of practicing medicine together, they developed both a social and professional relationships from which it is reasonable to conclude that they would not authorize suit against each other. As such, demand on Defendant Hinohara and Defendant Simpson is futile.

c.     Douglas S. Rohlen, President of Strategic Operations, is the son-in-law of Defendant Simpson. Because of Simpson's familial ties, demand on Defendant Simpson is futile.

d.     In order to bring this suit, a majority of the Directors of FoxHollow would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

e.     The acts complained of constitute violations of the fiduciary duties owed by FoxHollow's officers and directors and these acts are incapable of ratification.

f.     FoxHollow has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for FoxHollow any part of the damages FoxHollow suffered and will suffer thereby.

g.  In order to bring this suit, a majority of the directors of FoxHollow would be forced to sue themselves and/or persons with whom they have extensive business and/or personal entanglements, which they will not do, thereby excusing demand.

h.  The actions of the directors have impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands.

i.  Any suit by the directors of FoxHollow to remedy these wrongs would likely expose the Director Defendants and FoxHollow to further violations of laws which could result in additional civil actions being filed against one or more of the Director Defendants thus they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves.

j.  Making demand on all shareholders would also force Plaintiff to incur huge expenses, assuming all shareholders could even be individually identified.

## FIRST CAUSE OF ACTION

### Against Individual Defendants
### for Breach of Fiduciary Duty

80.  Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

81.  The Individual Defendants owed and owe FoxHollow fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe FoxHollow the highest obligation of good faith, fair dealing, loyalty and due care.

82.  The Individual Defendants, each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, UNJUST ENRICHMENT, AND GROSS MISMANAGEMENT                31

83.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition and business prospects of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

84.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, FoxHollow has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

85.     Plaintiff, on behalf of FoxHollow, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants
### for Abuse of Control

86.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

87.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability of control and influence FoxHollow, for which they are legally responsible.

88.     As a direct and proximate result of the Individual Defendants' abuse of control, FoxHollow has sustained significant damages.

89.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

90.     Plaintiff, on behalf of FoxHollow has no adequate remedy at law.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, UNJUST ENRICHMENT, AND GROSS MISMANAGEMENT         32

1

2

3

### THIRD CAUSE OF ACTION

### Against the Individual Defendants
### for Gross Mismanagement

4

91.    Plaintiff incorporates by reference and realleges each and every

5

allegation set forth above as if set forth fully herein.

6

92.    By their actions alleged herein, the Individual Defendants, either

7

directly  or  through  aiding  and  abetting,  abandoned  and  abdicated  their

8

9

responsibilities and fiduciary duties with regard to prudently managing the assets

10

and business of FoxHollow in a manner consistent with the operations of a publicly

11

held corporation.

12

93.    As direct and proximate result of the Individual Defendants' gross

13

mismanagement and breaches of duty alleged herein, FoxHollow has sustained

14

significant damages in excess of millions of dollars.

15

94.    Plaintiff, on behalf on FoxHollow, has no adequate remedy at law.

16

17

### FOURTH CAUSE OF ACTION

18

### Against the Individual Defendants
### for Waste of Corporate Assets

19

20

95.    Plaintiff incorporates by references and realleges each and every

21

allegation set forth above as if set forth fully herein.

22

96.    As result of the Individual Defendants' improper conduct and by failing

23

to properly consider the interests of the Company and its public shareholders by

24

failing to conduct proper supervision, Individual Defendants have caused FoxHollow

25

to waste valuable corporate assets by paying bonuses to certain of its executive

26

officers and incur potentially millions of dollars of legal liability and/or legal costs to

27

28

defend the Individual Defendants' unlawful actions.

---

97.   As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

98.   Plaintiff, on behalf of FoxHollow, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against the Individual Defendants
### for Unjust Enrichment

99.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

100.   By his wrongful acts and omission, the Individual Director Defendant was unjustly enriched at the expense of and to the detriment of FoxHollow.

101.   Plaintiff, as shareholder and representative of FoxHollow, seeks restitution from the Individual Defendant, and seeks an order from this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendant, from his wrongful conduct and fiduciary breaches.

## SIXTH CAUSE OF ACTION

### Against the Individual Defendants Simpson and Hinohara for Insider Selling

102.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

103.   At the time of Defendants' stock sales set forth herein, Defendants knew the information described above and sold FoxHollow stock on the basis of such information.

104.   The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider

Selling Defendants used for their own benefit when they sold FoxHollow common stock.

105.   Defendants' sale of FoxHollow common stock, while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

106.   Since they used the Company's proprietary information for their own gain this constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Defendants obtained thereby.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.   Against the Individual and Director Defendants in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.   Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C.   Awarding to FoxHollow restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: August 14, 2006                    Respectfully submitted,

**GREEN WELLING, LLP**

By: _____

Elizabeth C. Guarnieri

Robert S. Green
595 Market Street, Suite 2750
San Francisco, CA 94105
Telephone: (415) 477-6700
Facsimile: (415) 477-6710

William B. Federman
**FEDERMAN & SHERWOOD**
120 North Robinson, Suite 2720
Oklahoma City, OK 73102
Telephone: (405) 235-1560
Facsimile:  (405) 239-2112

*Attorneys for Plaintiff*

## **VERIFICATION**

I, _Leo J. Biermann_ declare that I have reviewed the Complaint ("Complaint") prepared on behalf of FoxHollow Technologies, Inc., and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of FoxHollow Technologies, Inc. common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

_Aug 6, 06_
Date

_Leo J. Biermann_
(Signature of Investor)