1

Robert S. Green (State Bar No. 136183)
**GREEN WELLING LLP**
595 Market Street, Suite 2750
San Francisco, CA  94105
Telephone: (415) 477-6700
Facsimile:  (415) 477-6710
cand.uscourts@classcounsel.com

2

3

4

5

William B. Federman
**FEDERMAN & SHERWOOD**
10205 North Pennsylvania Avenue
Oklahoma City, OK   73120
Telephone:  (405) 235-1560
Facsimile: (405) 239-2112

6

7

8

9

Attorneys for Plaintiffs

10

11

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

12

13

14

LEO J. BIERMANN and ANDREW I. SMITH,
Derivatively on Behalf of FOXHOLLOW
TECHNOLOGIES, INC.,

15

16

                        Plaintiffs,

17

v.

18

TOMOAKI HINOHARA, RYAN D. DRANT,
JEFFREY B. CHILD, JOHN B. SIMPSON,
SANFORD FITCH, ROBERT W.THOMAS,
RICHARD M. FERRAI AND MYRTLE S.
POTTER

19

20

21

                        Defendants,

22

and

23

FOXHOLLOW TECHNOLOGIES, INC.,

24

25

                        Nominal Defendant.

26

27

28

**Case No. C-06-4908 JW RS**

**VERIFIED AMENDED
SHAREHOLDER DERIVATIVE
COMPLAINT FOR BREACH OF
FIDUCIARY DUTY, CORPORATE
WASTE, UNJUST ENRICHMENT,
GROSS MISMANAGEMENT and
VIOLATION OF CALIFORNIA
CORPORATION CODE § 25402 AND
§ 25403**

**JURY TRIAL DEMANDED**

Plaintiffs, by their attorneys, submit this Verified Amended Shareholder Derivative Complaint (the "Complaint") against the Defendants named herein.

## NATURE OF THE ACTION

1.    This is a shareholder's derivative action brought for the benefit of Nominal Defendant FoxHollow Technologies, Inc. ("FoxHollow" or the "Company") against certain current and former members of its Board of Directors (the "Board") for violations of their fiduciary duties owed to FoxHollow from May 13, 2005 through the present (the "Relevant Period").[1]

2.    The claims asserted herein arise under state law for breach of fiduciary duty, unjust enrichment, gross mismanagement, and corporate waste.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.   This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

4.    Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the Defendants either resides in or maintains executive offices in this district, and Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

---

[1] Because Defendants have failed to take action to remedy the breaches of fiduciary duties that occurred between May 13, 2005 and January 26, 2006, the Relevant Period continues through this day instead of ceasing on January 26, 2006, the day before the public became aware of the wrongdoings at the Company.

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-06-4908 JW RS                                                              1

**BACKGROUND**

5.     FoxHollow was founded by Defendant John Simpson ("Simpson") in 1996.  The Company is based in Redwood City, California.  FoxHollow's sole product is a medical device called the SilverHawk, used to treat peripheral artery disease or PAD.  The catheter device is like a Roto-Rooter.  It is inserted inside a clogged artery, and a spinning blade within the catheter is switched on to cut through and remove plaque.

6.     In 2006, at the same time Simpson formed FoxHollow, he formed another company called Lumend, Inc. ("Lumend").  Lumend is also based in Redwood City.  It has one primary product, called the Frontrunner, which is a catheter device inserted into an artery to penetrate plaque blockages and treat PAD.  However, unlike FoxHollow's device, Lumend's device does not remove the plaque, but merely creates an opening for other treatments to then be used.

7.     Simpson, who had successfully formed other medical device companies and sold them for millions of dollars, spent several years trying to gauge the respective businesses of FoxHollow and Lumend, with contrasting results.  Ultimately, given the superiority of the FoxHollow technology and market interest, Simpson decided to only take FoxHollow public.

8.     In October 2004, FoxHollow commenced an initial public offering at $14 per share.  Overnight, Simpson's founders' stock – like that of his friends, family and medical colleagues who also invested pre-IPO – was worth millions.  Over the next year, as FoxHollow reported record revenues on a quarterly basis, and lauded the role of its senior management team in the Company's continuing success, its stock price more than tripled in value, surpassing $50 per share by July 2005.  It continued to trade between $45 and $55 for months thereafter, amidst continuing positive reports about the Company's award-winning senior staff.

9.     Unfortunately, Simpson was not content with the singular success of FoxHollow.  In 2005, Simpson, while serving as Chairman of the Board and a paid

1   "consultant" to the Company, ordered FoxHollow's senior management to use the

2   Company's assets to acquire Lumend.   The acquisition made no sense, involved

3   inferior technology, and was designed solely to benefit Simpson and his friends and

4   family.   Accordingly, certain members of FoxHollow's senior management balked at

5   the deal, despite threats from Simpson and his allies on the Board that they would be

6   replaced if they refused to go along with Simpson's edict.   This material information

7   was concealed from the public.

8          10.    Simpson, who was forced to sell Lumend at a lower price, then carried

9   out his threat and purged FoxHollow of its "disloyal" management.   The news was

10  devastating to FoxHollow and its shareholders.   After trading closed on Monday,

11  December 12, 2005, while the Company was reporting record sales and revenues,

12  and without any prior notice of discontent with management, FoxHollow announced

13  that its Board had decided to make a "change" in management and replace

14  Robert Thomas, the Company's President and CEO, with Simpson just two weeks

15  later, on January 1, 2006.   FoxHollow's share price fell from $46.12 to $38.97 the next

16  trading day on ten times ordinary volume.   Within one week, FoxHollow was trading

17  below $31 per share, a loss of **one-third** of its market capitalization or over ***$375***

18  ***million***.

19         11.    Without warning, after the close of trading on January 25, 2006,

20  FoxHollow announced that David Martin, the Chief Operating Officer, and

21  William Hoffman, the Vice President of Sales, were also going to be replaced.

22  FoxHollow reported that Duke Rohlen, Simpson's son-in-law, who had no prior public

23  management experience, had been promoted to President of Strategic Operations and

24  Matt Ferguson, Rohlen's brother-in-law, was remaining as CFO.   Over the next three

25  days, FoxHollow's share price fell from $27.34 to a low of $23.35, another 15% loss.

26         12.    Together, after disclosure of the management purge, the Company's

27  stock lost 50% of its value in just over one month.   The total market value loss is

28  estimated at over ***$600 million***.

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-06-4908 JW RS                                                          3

**PARTIES**

13.   Plaintiff Leo J. Biermann ("Biermann") was at all relevant times, a shareholder of Nominal Defendant FoxHollow and is a citizen of Missouri.

14.   Plaintiff Andrew I. Smith ("Smith") was at all relevant times, a shareholder of Nominal Defendant FoxHollow and is a citizen of Mississippi.

15.   Collectively, Biermann and Smith are referred to herein as the "Plaintiffs."

16.   Defendant FoxHollow Technologies, Inc. is a corporation organized under the laws of Delaware, with principal executive offices at 740 Bay Road, Redwood City, California.

17.   Defendant Tomoaki Hinohara ("Hinohara") has served as a Director since 1997.  Hinohara was a member of the Company's Compensation Committee until his resignation on December 11, 2006.  He currently serves on the Company's Board of Directors Nominating and Governance Committee.  Based on his knowledge of material non-public information regarding the Company, Defendant Hinohara sold approximately 85,164 shares (almost all of his holdings) of FoxHollow stock for proceeds of almost $3,000,000.00 during the Relevant Period.  Upon information and belief, Hinohara is a citizen of California.

18.   Defendant Ryan D. Drant ("Drant") has served as a Director from 1998 until his resignation on June 27, 2006.  During that time, Drant served on the Company's Board of Directors' Compensation Committee, Audit Committee and Nominating and Governance Committee.   Upon information and belief, Drant is a citizen of California.

19.   Defendant Jeffrey B. Child ("Child") has served as a Director since 2005.  Child is also a member of the Company's Board of Directors' Compensation Committee and Audit Committee.  Upon information and belief, Child is a citizen of California.

20.     Defendant John B. Simpson ("Simpson") founded FoxHollow and has served as a Director since its inception in 1996.  From October 1996 to July 1997, Simpson served as President of FoxHollow.  From May 2004 to December 2005, Simpson served as President of FoxHollow.  From May 2004 to December 2005, Simpson served as a paid consultant to FoxHollow.  From January 2005 to June 5, 2006, Simpson served as the Interim CEO and then became the permanent CEO.  Simpson, along with his family members and related trust, companies, and venture capital funds, is a large and controlling shareholder of FoxHollow.    Based on his knowledge of material non-public information regarding the Company, Defendant Simpson sold approximately 400,411 shares of FoxHollow stock for proceeds of approximately $15,000,000.00 during the Relevant Period.   Upon information and belief, Simpson is a citizen of California.

21.     Defendant Sanford Fitch ("Fitch") has served as a Director since 2004.  Fitch also serves on the Company's Board of Directors' Audit Committee and is its Chairperson.  Fitch served on the Nominating and Governance Committee until his resignation on December 11, 2006.  Following Fitch's resignation Defendant Hunt and Potter were appointed by the Board to its Nominating and Corporate Governance Committees.  Upon information and belief, Fitch is a citizen of California.

22.     Defendant Myrtle S. Potter ("Potter") has served as a Director of FoxHollow since 2005.  Potter was appointed as a member of the Board's Audit Committee to replace Defendant Drant upon his resignation on June 28, 2006.  Potter resigned from the Audit Committee on December 11, 2006.    Non-defendant Michael Hunt, who was newly appointed as a Board member on December 11, 2006, replaced Defendant Potter.   Upon information and belief, Potter is a citizen of California.

23.     Defendant Robert W. Thomas has served as the Company's President and Chief Executive Officer since March 2000 and as a member of its Board since April 2000. From June 1998 to March 2000, Thomas served as the Company's Vice

President of Operations. On January 3, 2006, the Company entered into a Separation Agreement and Release with Thomas. Upon information and belief Thomas is a citizen of California.

24.     Defendant Richard M. Ferrari has served as a member of the Company's Board since April 2001. Ferrari resigned from the Board on June 17, 2005. Defendant Child was appointed to fill the vacancy created by Ferrari's resignation.

25.     Collectively, the Defendants are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of FoxHollow's quarterly and annual reports and other SEC filings, press releases, presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed form the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the concealments and statements which were each "group-published" information, the result of the collective actions of the Individual Defendants.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

26.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to

1    act in furtherance of the best interests of the Company and its shareholders so as to

2    benefit all shareholders equally and not in furtherance of or for their personal interests

3    or benefit.  Each director and officer of the Company owes and owed to the Company

4    and its shareholders the fiduciary duty to exercise good faith and diligence in the

5    administration of the affairs of the Company and in the use and preservation of its

6    property and assets, and the highest obligations of fair dealing.

7            27.    To discharge their duties, the officers and directors of the Company were

8    required to exercise reasonable and prudent supervision over the management,

9    policies, practices and controls of the Company.  By virtue of such duties, the officers

10   and directors of the Company were required to, among other things:

11                  a.    exercise good faith in ensuring that the affairs of the Company
                         were conducted in an efficient, business-like manner so as to
12                       make it possible to provide the highest quality performance of
                         their business;
13
                   b.    exercise good faith in ensuring that the Company was operated in
14                       a diligent, honest and prudent manner and complied with all
                         applicable federal and state laws, rules, regulations and
15                       requirements, including acting only within the scope of its legal
                         authority;
16
                   c.    exercise good faith in supervising the preparation, filing and/or
17                       dissemination of financial statements, press releases, audits,
                         reports or other information required by law, and in examining and
18                       evaluating any reports or examinations, audits, or other financial
                         information concerning the financial condition of the Company;
19                       and

20                 d.    exercise good faith in ensuring  that the Company's financial
                         statements were prepared in accordance with Generally Accepted
21                       Accounting Principles ("GAAP"); and

22                 e.    refrain from unduly benefiting themselves and other Company
                         insiders at the expense of the Company.
23

24                        **FACTUAL ALLEGATIONS**

25   **A.    1996:  Simpson Forms FoxHollow and Lumend**

26           28.    In 1996, Simpson formed FoxHollow to market a device used to treat

27   peripheral artery disease or PAD.  The device called the SilverHawk is used to collect

28   and remove plaque in order to reopen narrowed or blocked arteries.

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-06-4908 JW RS                                                              7

29.     Similarly, in 1996, at the same time he was forming FoxHollow, Simpson formed another private company, Lumend, along with Matthew Selmon.  For years, Selmon has been Simpson's medical partner at a private cardiology practice in Redwood City, near Sequoia Hospital.  Similar to FoxHollow, Lumend's primary product was called the Frontrunner, which is a catheter used by physicians to penetrate and "cross" an occlusion or blockage in the artery.  Unlike the SilverHawk, the Frontrunner simply crosses the blockage so that other treatments, such as angioplasty or stents, can be used to treat the problem.  The Frontrunner does not actually remove the plaque.

30.     Lumend has other similarities with FoxHollow.  Tomoaki Hinohara, who also practices with Simpson and Selmon in Redwood City, helped to invent and develop the Lumend technology and is listed as a co-inventor on several patents issued to or patent applications made by Lumend.  At the same time, Hinohara served as a director of FoxHollow.

31.     Before its IPO, FoxHollow was financially backed by Simpson, through his affiliated venture capital firm called De Novo Ventures.  De Novo, which is based in Menlo Park, also was one of the primary investors in Lumend.  De Novo was co-founded in 2000 by Simpson and Richard Ferrari.  Ferrari also served on FoxHollow's Board of Directors until 2005.

32.     Douglas S. Rohlen or "Duke" Rohlen is Simpson's son-in-law and the brother-in-law of Ferguson, FoxHollow's CFO.  Neither Rohlen nor Ferguson had served as an officer or director of a public company.  Before joining FoxHollow, Rohlen worked as the Director of Business Development at Lumend for this father-in-law.

33.     Unlike FoxHollow's SilverHawk technology, Lumend was a market failure and failed to make significant inroads into the PAD treatment market.  Its Frontrunner device was also inferior to other treatment alternatives available to physicians, including the SilverHawk.

34.    Accordingly, after receiving clearance from the FDA to market the SilverHawk, Simpson devoted his efforts to FoxHollow's business.  Between 2003 and 2004, Simpson directed management to build a direct sales force organization and initiate sales to medical centers.   With the efforts of Robert Thomas, CEO, David Martin, COO, and William Hoffman, Vice President of Sales, FoxHollow then introduced its product to the United States, with significant success.  By September 2004, FoxHollow had 217 employees and had just completed a move into a 61,000 square foot facility in Redwood City.

**B.    2004:  Simpson Takes FoxHollow Public**

35.    In September 2004, FoxHollow commenced filings with the SEC to take the Company public.

36.    At the time, the Company's senior management included Thomas, CEO, Matt Ferguson, CFO, Martin, COO, and Hoffman, Vice President of Sales.   The Company's Board of Directors included Simpson, Hinohara, Ferrari, Thomas, Ryan Drant and Sanford Fitch.   In addition, in May 2004, FoxHollow and Simpson entered into a consulting agreement whereby Simpson was paid $25,000 per month to provide consulting services.

37.    On or about October 28, 2004, FoxHollow filed its Registration Statement and Prospectus to initiate its initial public offering.  FoxHollow offered 4.5 million shares of its common stock at an initial price of $14.00 per share.  At the time, according to the Prospectus, De Novo held 2,075,173 shares and 32,451 options and warrants, representing 12% of the Company before the IPO and 9.5% after the IPO. Simpson held 7,814,693 shares and 117,061 options and warrants, representing 44.8% before the IPO and 35.7% after the IPO.

38.    On December 6, 2004, FoxHollow filed with the SEC its Form 10-Q for the third quarter ending September 30, 2004.  The Company announced that net revenues were $11.6 million for the first three months ended September 30, 2004 compared to $650,000 for the three months ended September 30, 2003.  The

Company announced that net revenues were $23.9 million for the nine months ended September 30, 2003.  The Company disclosed that its IPO completed on October 28, 2004 had sold 4.5 million shares at $14.00 per share, and on October 29, 2004 the underwriters had exercised their over-allotment option to purchase 675,000 shares at $14.00 per share.  Proceeds from the offering were about $67.4 million.

39.     On February 14, 2005, FoxHollow filed with SEC its Form 8-K, and issued a related press release, announcing its fourth quarter 2004 and year end results.  The Company announced that its fourth quarter revenues were $14.7 million, a 27% increase over the $11.6 million reported for third quarter of 2003.  For the full year, FoxHollow reported net revenues of $38.6 million, compared to $2.6 million for 2003.

40.     On March 28, 2005, FoxHollow filed with the SEC its Form 10-K, reiterating these financial results.   The Company also disclosed that, as of December 31, 2004, it had increased its staff to 244 employees, noting that "We believe that our future success will depend on our continued ability to attract, hire and retain qualified personnel."   The Company also disclosed that the Board's Compensation Committee had increased the salary of Thomas, its CEO, from $275,000 to $300,000, and the salary of Martin, its COO, from $175,000 to $225,000, and in addition, approved a bonus plan whereby these executives would be eligible for cash bonuses in the event certain key performance targets were met or exceeded.

41.     On April 8, 2005, FoxHollow issued a press release announcing that lock-up agreements entered into in conjunction with the IPO would be extended 19 days, or until May 13, 2005, and the first sales of restricted shares could take place on May 16, 2005.  The lock-up period had been due to expire on April 26, 2005, based on the planned timing of FoxHollow's quarterly earnings release.  However, the release was delayed until April 17, 2005.  The extension affected about 17.7 million shares of stock, much of it owned by the Individual Defendants or their affiliates.

42.     On April 27, 2005, FoxHollow filed with the SEC its Form 8-K, and issued a related press release, announcing its financial results for the first quarter of 2005 ended March 31, 2005. The Company announced that its revenue was $21.5 million, which was a 46% increase over revenue of $14.7 million in the fourth quarter of 2004 and a 350% increase over first quarter 2004 revenue of $4.8 million. The Company reported a gross margin of 59% for the first quarter of 2005 versus 52% in the fourth quarter of 2004 and 14% in the first quarter of 2004. Net loss for the quarter was $6.5 million, compared with a net loss of $7.5 million in the fourth quarter of 2004. Robert Thomas stated, "These results reflect FoxHollow's success in developing and penetrating the market for treating PAD and our ability to grow our sales force and manufacturing capacity, as well as the compelling patient outcomes achieved with our device." Thomas also noted that FoxHollow ended the quarter with 89 direct salespeople, compared with 69 in the fourth quarter of 2004, and was on track to have about 125 sales professionals by the end of 2005.

43.     On April 29, 2005, FoxHollow filed with the SEC its Schedule 14A Proxy Statement, giving notice of its 2005 annual meeting to be held on June 16, 2005.  The Proxy also included a summary compensation table for FoxHollow's senior executives in 2003 and 2004, indicating that Thomas, Martin and Hoffman all received raises in 2004, along with cash bonuses and long term stock option awards. In the Compensation Committee's report, it noted that Thomas' salary for 2004 was based on Thomas' qualifications, knowledge and experience and his individual performance at FoxHollow.

### C.   2005-2006:  The False and Misleading Statements

44.     On May 13, 2005, FoxHollow filed with the SEC its Form 10-Q for the first quarter of 2005, signed by Ferguson. FoxHollow reported its financial results for the first quarter, including record quarterly revenues. Notably, within the litany of "Factors Affecting Future Operating Results" listed by FoxHollow in its 10-Q, and

repeated in all future 10-Qs filed with the SEC during the Relevant Period, were the following:

> "We depend on skilled and experienced personnel to operate our business effectively. If we are unable to recruit, hire and retain these employees, our ability to manage and expand our business will be harmed, which would impair our future revenue and profitability.
>
> Our success largely depends on the skills, experience and efforts of our officers and other key employees. Any of our officers and other key employees may terminate their employment at any time. The loss of any of our senior management team could harm our business. Our ability to retain our skilled labor force and our success in attracting and hiring new skilled employees will be a critical factor in determining whether we will be successful in the future. We may not be able to meet our future hiring needs or retain existing personnel. We will face particularly significant challenges and risks in hiring, training, managing and retaining engineering and sales and marketing employees. Failure to attract and retain personnel, particularly technical and sales and marketing personnel, would harm our ability to compete effectively and grow our business. The announcement of the loss of one of our key employees could negatively affect our stock price.
>
> "If we make acquisitions or divestitures, we could encounter difficulties that harm our business.
>
> We may acquire companies, products or technologies that we believe to be complementary to the present or future direction of our business. If we engage in such acquisitions, we may have difficulty integrating the acquired personnel, financials, operations, products or technologies. Acquisitions may dilute our earnings per share, disrupt our ongoing business, distract our management and employees and increase our expenses, which could harm our business. If we use our common stock to acquire companies, products or technologies, it may substantially dilute the percentage of the company held by stockholders who own securities prior to the acquisition."

45.     These same disclosures were made in other filings made during the Relevant Period. FoxHollow readily acknowledged the material aspects of these specific risks - loss of key management and devotion of resources to acquisitions - to the Company's viability, operations, financial performance and stock price. As key risks to FoxHollow, all material information to these risks should have been disclosed to the public.

46.     On May 18, 2005, Thomas, FoxHollow's CEO, was given the top award - the ABBY - at the Seventh Annual Innovations in a Healthcare event and awards

1   ceremony in Orange, California. The award was presented by the Adaptive Business

2   Leaders Organization, comprised of CEOs and Presidents of healthcare and

3   technology firms in the United States. A news release of the award, published on

4   PRNewswire on May 19, 2005, stated that Thomas was recognized for his work at

5   FoxHollow, including $40 million in revenues and going public over the past two

6   months.

7       47.    During the ten-day trading period, between May 16, 2005 and May 26,

8   2005, FoxHollow's share price climbed from about $30 per share to $40 per share on

9   heavy volume.

10      48.    On June 20, 2005, FoxHollow filed with the SEC a Form 8-K and issued

11  a press release announcing that Defendant Jeffrey Child was appointed to the Board

12  of Directors to fill a vacancy created by Richard Ferrari, who resigned on June 17,

13  2005. FoxHollow did not disclose that Child was a close friend and neighbor of

14  Ferguson.

15      49.    On July 27, 2005, FoxHollow filed with the SEC a Form 8-K and issued a

16  press release announcing its financial results for the second quarter of fiscal year

17  2005 ended June 30, 2005, including revenue for the quarter of $28.7 million, a 33%

18  increase over revenues of $21.5 million in the first quarter of 2005, and a 283%

19  increase over revenues of $7.5 million in the second quarter of 2004. The Company

20  also reported a gross margin of 69% in the second quarter, versus 59% in the first

21  quarter of 2005 and 19% in the second quarter of 2004. The net loss for the quarter

22  was $3.4 million compared to a net loss of $6.5 million in the first quarter of 2005 and

23  a net loss of $8.8 million in the second quarter of 2004.

24      50.    On July 28, 2005, FoxHollow's stock price soared about 18% to an all

25  time high trading price of $55.20.  The trading volume was almost 5 million shares,

26  more than ten times ordinary volume, and the largest single trading day in the

27  Company's history (other than its IPO).

28

51.     On July 28, 2005, FoxHollow filed with the SEC its Form 10-Q for the second quarter of 2005, signed by Ferguson.  FoxHollow reported its financial results for the second quarter, including record quarterly revenues.

52.     On October 26, 2005, FoxHollow filed with the SEC a Form 8-K, and issued a press release, announcing its financial results for the third quarter of fiscal year 2005 ended September 30, 2005. The Company's reported revenue for the third quarter was $36.1 million, a 26% increase over revenue of $28.7 million in the second quarter of 2005 and a 212% increase over revenue of $11.6 million in the third quarter in 2004. The Company reported a gross margin of 73% versus 69% in the prior quarter and 40% in the third quarter of 2004. Net loss for the quarter was $1.5 million, compared to a net loss of $3.4 million in the second quarter of 2005 and a net loss of $7.4 million in the third quarter of 2004. Excluding stock-based compensation expenses, FoxHollow actually reported net income for the first time. The Company also announced other significant accomplishments, including an agreement with Merck, promising treatment data presented at a trade meeting, the expansion of its manufacturing facility, and increased production capacity to meet future orders.

53.     On November 1, 2005, FoxHollow filed with the SEC its Form 10-Q for the third quarter of 2005, signed by Ferguson.  FoxHollow reported its financial results for the third quarter, including record quarterly revenues.

54.     On November 7, 2005, FoxHollow filed with the SEC its Form 8-K, and issued a press release, announcing a new lease for a 124,274 square foot facility. FoxHollow also announced that Myrtle Potter had been appointed to the FoxHollow Board.  FoxHollow did not disclose that Potter had just purchased her new home in Woodside from Duke Rohlen, Simpson's son-in-law.

55.     During the Relevant Period, the representations made by Defendants about FoxHollow, its business and operations, the performance of senior management, and its future expectations, were false and misleading.  As described below, they misrepresented and/or omitted the following adverse facts which then

1   existed and disclosure of which was necessary to make the statements made not false

2   and/or misleading.

3          56.    Specifically, at Simpson's direction, and with the Board's knowledge and

4   concurrence, certain members of FoxHollow's senior management - including

5   Thomas, Martin and Hoffman - had been ordered to complete the acquisition of

6   Simpson's other private company, Lumend. Simpson also threatened Thomas that, in

7   the event he did not acquire Lumend, he would be terminated as CEO,

8   notwithstanding his years of successful service to the Company and its shareholders.

9   Remarkably, while FoxHollow regularly reported that the loss of any of its senior

10  management would negatively impact the Company and its share price, and that any

11  acquisition, even one thought to be in the Company's best interests, could adversely

12  impact the Company due to the costs and efforts imposed by the acquisition,

13  Defendants concealed both Simpson's edict and his threats of termination to the

14  public.

15         57.    Senior management refused to go forward with the deal, since the

16  acquisition did not make sense for FoxHollow, which already had a tested, market

17  proven catheter product, and already had developed sales and marketing programs

18  and trained employees based on its device's unique capabilities. Conversely,

19  Lumend's device was an inferior technology, untested and unproven in the market.

20  Lumend also did not have a fully capable infrastructure in place, and FoxHollow would

21  have been forced to devote substantial resources to the untested device, even though

22  it was premature and not commercially viable. Moreover, the cost of acquiring Lumend

23  was far above its market value, essentially constituting a gift to Simpson and affiliates

24  who were investors in Lumend. Indeed, there was no rational business reason for

25  acquiring Lumend other than to pay off Simpson.

26         **D.    FoxHollow Discloses the Management Purge and it Stock Plunges**

27         58.    After the close of trading on December 12, 2005, FoxHollow filed a Form

28  8-K with the SEC, and issued a press release entitled, "FoxHollow Technologies

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-06-4908 JW RS                                                              15

Announces Management Transition." While Simpson had essentially forced Thomas to depart FoxHollow due to the Lumend deal, the press release reported that Thomas had "informed the Company's Board of Directors that he will be retiring" as President and CEO and resigning from the Board effective January 1, 2006 - i.e., just two weeks later. FoxHollow also announced that Simpson would replace Thomas as "interim" CEO. Simpson stated, "I have maintained a very active role with the Company and look forward to leading our outstanding group of senior management until we have named a replacement. We will be looking for a permanent chief executive officer who has extensive leadership experience and who can lead the Company through its next stage of growth." Even this brief statement was misleading, since Simpson did not intend on leading its present senior management nor view them as "outstanding." To the contrary, Simpson planned to also fire Martin and Hoffman just a few weeks later. FoxHollow also announced that a "management leadership committee" had been formed, comprised of Ferguson, Martin, Ron Steckel, and Duke Rohlen.

59.     The news took the market by complete surprise during a period in which FoxHollow had been reporting market and financial successes, record revenues, a first time profit, expanding facilities, and hiring new personnel. On December 13, 2005, FoxHollow's share price plunged from the prior day's close of $46.12 to $38.97, a 15.5% drop.  The trading volume was massive, with over 4.5 million shares traded - the second largest trading day in the Company's history. In the next few days, on continued large trading volume, FoxHollow's stock price fell to about $30 per share or a one-third loss of market capitalization.

60.     After the news, TheStreet.com reported that Herb Greenberg of Marketwatch "believes there is more to the story" and "raised a red flag over the sudden retirement announcement of FoxHollow CEO Robert Thomas. Greenberg said Thomas is just 44 years old and `loved the company.'" According to AP reports, Piper Jaffray analyst Thomas Gunderson stated in a research report, "There is a strong feeling of another shoe to drop in this story."

61.     On January 9, 2006, FoxHollow filed with the SEC its Form 8-K, and issued a press release, announcing its preliminary financial results for the fourth quarter ended December 31, 2005 and the full fiscal year 2005, as well as its guidance for the first quarter and full fiscal year of 2006. While the Form 8-K, signed by Ferguson, indicated that previously forecasted revenue for the fourth quarter and the full year 2004 remained on course, there was no mention of the management "transition." Instead, Simpson touted the results reached on Thomas' watch, stating "Our tremendous growth in 2005 and growth outlook for 2006 is based on our success in driving adoption for existing customers, as well as the significant increase of our customer base. Revenues for 2005 more than tripled from 2004. Our outlook for 2006 represents a more than 60 percent growth in year-over-year revenue."

62.     With respect to management of the Company, Simpson stated, "We have initiated a search for a new chief executive officer and have selected the firm of Spencer Stuart to assist us with that search. While looking forward to the completion of the search process, we are confident in the abilities of the senior management team already in place."

63.     Yet, just two weeks later, just as the flurry of market activity in FoxHollow's stock started from the sudden and unexpected departure of its CEO, a much different picture of senior management was revealed.  On January 26, 2006, FoxHollow filed with the SEC its Form 8-K, signed by Ferguson, and issued a press release, announcing that David Martin was being replaced as Chief Operating Officer and William Hoffman was being replaced as Vice President of Sales. Duke Rohlen, Simpson's son-in-law, was promoted to President of Strategic Operations and Ferguson remained as CFO. Simpson explained, "Based on the new strategic initiatives we announced earlier this month, it is appropriate to effect this transition at this time." On the news, FoxHollow's share price fell 7% the next trading day and about 15% within three days, reaching a new yearly low of $23.35.

64.    Collectively, after public revelation of FoxHollow's management "transition," which was the end result of Simpson's undisclosed edict to Company management to acquire Lumend or else be terminated, shareholders lost 50% of their stock value in just over one month.  The total market value loss is estimated at over $600 million.

65.    Not surprisingly, FoxHollow's stock value has yet to recover from the revelation of this material information.  FoxHollow recently announced that Simpson was changing his title from the "interim" CEO to the permanent CEO.  Simpson attributes the Company's sales success to its "strong management team" – i.e., his son-in-law, Duke, and his brother-in-law Ferguson.  On the news that Simpson was remaining as CEO, the stock dropped more than 10%.

66.    During the Relevant Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated FoxHollow's stock price and operated as a fraud and deceit on purchasers of FoxHollow common stock.  Material information about Simpson's edict to Company management to acquire Lumend, and his decision to terminate senior management if and when they refused to follow the edict, was concealed.  When the result of such edict, the sudden and unexpected departure of the three highest ranking members of management, was disclosed and became apparent to the market, the price of FoxHollow stock fell precipitously on massive trading volume as the prior artificial inflation came out of FoxHollow's stock.

67.    As a result numerous securities class action lawsuits have been instituted against the Company causing the Company to incur unnecessary legal fees and investigatory expenses and exposing the Company to hundreds of millions of dollars in liability for securities fraud.  In addition the Company's reputation has been irreparably damaged and its ability to obtain equity and debt financing on favorable terms have been impaired.

68.     Further, during the Relevant Period and while in possession of material undisclosed information, Defendants Simpson and Hinohara sold millions of dollars of their personally held FoxHollow shares.  The insider stock sales that occurred within the Relevant Period are set forth below:

Defendant Simpson:[2]

| Date | Shares Sold | Proceeds |
|------|-------------|----------|
| 05/31/05 | 139,073 | $ 4,915,501.90 |
| 07/01/05 | 41,773 | $ 1,581,260.80 |
| 08/01/05 | 41,773 | $ 2,009,915.60 |
| 08/30/05 | 41,773 | $ 1,748,273.39 |
| 10/03/05 | 18,800 | $   799,449.00 |
| 10/31/05 | 39,073 | $ 1,284,497.90 |
| 11/30/05 | 39,073 | $ 1,694,051.90 |
| 01/03/06 | 39,073 | $ 1,183,911.90 |
| **TOTAL:** | **400,411** | **$15,216,862.39** |

Defendant Hinohara:[3]

| Date | Shares Sold | Proceeds |
|------|-------------|----------|
| 05/31/05 | 4,000 | $   146,000.00 |
| 07/01/05 | 40,164 | $1,161,540.00 |
| 08/30/05 | 1000 | $    44,540.00 |
| 10/03/05 | 4000 | $   186,960.00 |
| 10/31/05 | 12,000 | $   543,243.00 |
| 11/30/05 | 4,000 | $   171,400.00 |

---

[2] Includes shares sold by the Simpson Family Trust, John Simpson Trustee

[3] Does not include shares owned by Hinohara Associates, Inc., or Hinohara Trust

| 01/03/06 | 4,000 | $ 121,200.00 |
| 01/31/06 | 4000 | $ 95,600.00 |
| 02/28/06 | 4000 | $ 108,440.00 |
| 04/03/06 | 4000 | $ 122,520.00 |
| 05/01/06 | 4000 | $ 125,220.00 |
| TOTAL: | 85,164 | $2,826,663.00 |

## DEMAND WOULD BE FUTILE

69.     Plaintiffs bring this action derivatively in the right and for the benefit of FoxHollow to redress injuries suffered and to be suffered by the Company as a result of the breaches of fiduciary duty by the Individual Defendants.

70.     Plaintiffs were owners of FoxHollow common stock during the Relevant Time Period in which the Individual Defendants' wrongful course of conduct alleged herein was occurring through the present.

71.     Plaintiffs will adequately and fairly represent the interests of FoxHollow and its shareholders in enforcing and prosecuting its rights.

72.     Plaintiffs did not make a demand on FoxHollow's Board to bring these claims alleged herein because such a demand would have been futile.  At the time of filing Plaintiffs' original Complaint, the Board of Directors of the Company consisted of Defendants Hinohara, Child, Simpson, Fitch and Potter.[4]   Each of these Board members has been named as a defendant in this action.  In addition, Defendant Simpson has been named as a defendant in the related securities class action lawsuits.  As detailed below, each of the directors face a substantial likelihood of liability on the derivative claims alleged herein and is therefore in no position to render a disinterested judgment as to whether the Company should bring such claims, and/or

---

[4] Since the filing of Biermann's original Complaint, the Company increased the size of its board and appointed Michael H. Hunt and Richard N. Kender as Directors.

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-06-4908 JW RS                                                          20

1  lacks sufficient independence with which to render a disinterested decision on whether

2  to pursue the derivative claims against the Individual Defendants.

3       73.   During the Relevant Time Period, Defendants Simpson and Hinohara

4  engaged in illegal insider trading during the Relevant Time Period.   Because

5  Defendants Simpson and Hinohara receive an improper benefit not received by other

6  shareholders as a result of their sales they face a substantial likelihood of liability for

7  these illegal stock sales and demand on them is futile.

8       74.   Defendant Directors concealed form the public and shareholder

9  Simpson's edict and threats to terminate senior management if they filed to complete

10  on his behalf FoxHollow's acquisition of Simpson's private company, Lumend.   As a

11  result each of the Defendants face substantial liability for breaches of fiduciary duty

12  and demand on them is futile.

13       75.   According to the Company's Form 14 Defendant Simpson owns

14  beneficially 24% of the Company's outstanding stock.  As a result, Defendant Simpson

15  is able to exercise significant control and influence over the management and affairs of

16  the Company and dominates the Board of the Company.

17       76.   Each of the Director Defendants signed reports field with the SEC

18  containing false and misleading statement during the Relevant Time Period.

19       77.   In addition, demand would be futile and useless for the additional

20  following reasons:

21       a)   The Director Defendants, because of their inter-related business,

22  professional and personal relationships, have developed debilitating conflicts of

23  interest that prevent the Board members of the Company from taking the necessary

24  and proper action on behalf of the Company as requested herein;

25       b)   The Director Defendants of FoxHollow, as more fully detailed herein,

26  participated in, approved and/or permitted the wrongs alleged herein to have occurred

27  and participated in efforts to conceal or disguise those wrongs from FoxHollow's

28  stockholders and the public and  recklessly disregarded the wrongs complained of

herein, and are therefore not disinterested parties.  Each of the Director Defendants exhibited a sustained and systematic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

c)       In order to bring this suit, a majority of the directors of FoxHollow would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

d)       The acts complained of constitute violations of the fiduciary duties owed by FoxHollow's officer and directors and these acts are incapable of ratification; and

e)       FoxHollow has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover FoxHollow any part of the damages FoxHollow suffered and will continue to suffer.

78.      Additionally, Derivative Plaintiffs have not made a demand on the board of directors to bring these causes of action because such a demand would be futile and useless act for the following reasons:

a.       Defendant Hinohara practices cardiology with Defendant Simpson at Sequoia Hospital Redwood City, CA.  Both Defendant Hinohara and Defendant Simpson are involved in Stanford's University Biodesign Innovation Program.   Dr. Hinohara's earlier research focused upon the Directional coronary Atherectomy procedure that was developed by Defendant Simpson.  During their several years of practicing medicine together, they developed both a social and professional relationships from which it is reasonable to conclude that they would not authorize suit against each other.  As such, demand on Defendant Hinohara and Defendant Simpson is futile.

b.       Additionally, Defendant Hinohara helped develop the technology for Lumend, a private company formed by Defendant Simpson. Defendant Hinohara is listed as a co-inventor on several patents issued to or patent applications made by Lumend.  (Catheter apparatus for treating arterial occlusions, Patent No. 6157852, 2000; Catheter apparatus for guided transvascular treatment of arterial occlusions, Patent No. 6241667, 200; Method and apparatus for the guided bypass of coronary occlusions, Patent No. 6081738, 2000; Catheter apparatus for treating arterial occlusions, Patent No. 6266550, 2001).

c.  Defendant Hinohara is a co-inventor on a patent assigned to Perclose Incorporated, a company founded by Defendant Simpson. (Device and method for the percutaneous suturing of a vascular puncture site, Patent No. 5465733, 1995).

d.  Defendant Hinohara is listed as co-inventor on a patent in which another patented procedure, previously granted to Defendant Simpson, is referred to and wholly incorporated into Hinohara's patent.  (Guide wire for catheters and method for its use. Patent No. 5465733, 1995).

e.  Defendants Hinohara and Simpson have also published an impressive amount of medical research together.  Such articles include, but are not limited to,:

    a. Arterioscler Thromb.  1994 Oct; 14(10):1648-56.
    b. Catheter Cardiovasc Interv.  2004 Jan;61(1):35-43.
    c. Atherosclerosis.  2000 Sep;152(1):117-26.
    d. Coron Artery Dis. 1996 Apr;7(4):282-9.
    e. Arterioscler Thromb Vasc Biol. 1996 Apr;16(4):576-84.
    f. Am J Pathol. 1994 Oct;145(4):883-94.
    g. Am J Cardiol. 1993 Oct 18;72(13):6E-11E.
    h. Am J Pathol. 1993 Oct 18;72(13):30E-34E.
    i. Circ Res. 1993 Aug;73(2):223-31.
    j. Cathet Cardiovasc Diagn. 1993;Suppl 1:61-71.
    k. Circulation. 1992 Nov;86(5):1394-9.
    l. Am J Cardiol. 1992 Nov 1;70(13):1101-8.
    m. J Am Coll Cardiol. 1992 Sep;20(3):623-32.
    n. J Am Coll Cardiol. 1991 Apr;17(5):1112-20.
    o. J Invasive Cardiol. 1990 Sep-Oct;2(5):217-26.
    p. Am J Cardiol. 1990 Jul 1;66(1):49-53.
    q. Circulation. 1990 Mar;81(3 Suppl):IV79-91.
    r. J Invasive Cardiol. 1990 Mar-Apr;2(2):57-63.
    s. J Am Coll Cardiol. 1990 Feb;15(2):419-25.
    t. Int J Card Imaging. 1989;4(2-4):117-25.
    u. J Am Coll Cardiol. 1988 May;11(5):977-82.
    v. Ann Thorac. Surg.  1986 Oct;42(4):399-405.
    w. Am J Cardiol. 1986 Mar 1;57(8):684-6.

Based on their interconnected business relationships, demand on Defendants Hinohara and Simpson is futile.

f.  Defendant Simpson is a Consulting Professor of Medicine at Stanford University.  Defendant Hinohara also practices medicine at Stanford.  Both are involved in the Biodesign Network (BDN), a group that focuses on assisting student and faculty at Stanford to bring their innovations forward into development in the commercial healthcare industry.  Both Defendant Simpson and Defendant Hinohara are members of the BDN Leadership Group.  Based on their interconnected business relationships, demand on Defendants Hinohara and Simpson is futile.

g.  Both Defendant Simpson and Hinohara have deep connections to Duke University School of Medicine.  Defendant Simpson attended medical school at Duke, and Defendant Hinohara received his post-graduate fellowship from Duke's School of Medicine.  Based on

their interconnected social relationship, demand on Defendant Simpson and Hinohara is futile.

h.    Defendants Simpson and Hinohara were both directors of Perclose, a company that has subsequently been acquired by Abbott Laboratories.    Defendant Simpson founded Perclose in 1992. Defendant Hinohara was a major investor in and director of Perclose.    Based on Defendant Simpson and Hinohara's interconnection business and financial relationships, demand on them is futile.

i.    Defendant Fitch received his MBA from Stanford Business School. Defendant Potter is a member of the Stanford Business School Advisory Council.    Defendants Simpson and Hinohara's ties to Stanford are described above.    Because Defendants Simpson, Hinohara, Fitch and Potter have significant educational background and/or current involvement with Stanford University, demand on them is futile based on their considerable interrelated social and philanthropic relationships.

j.    Over the years, the Company's Board of Directors has manifested a direction of corporate conduct in such a manner as to comport with the wishes of Defendant Simpson.    For instance, the Company entered into an agreement with JBS Consulting, LLC ("JBS Consulting") and an agreement with JBS Consulting and Defendant Simpson regarding the use of a private aircraft owned by JBS Consulting for company business.    Defendant Simpson is the president and managing officer of JBS Consulting.    Pursuant to these agreements, JBS Consulting will be reimbursed for the cost of airfare in connection with company business.

k.    Douglas S. Rohlen, President of Strategic Operations, is the son-in-law of Defendant Simpson, for which he earns $200,000.00 with a target bonus of $225,000.00.    Rohlen is also the brother-in-law of Matthew B. Ferguson, the Company's Chief Financial Officer. Because of Simpson's familial ties, demand on Defendant Simpson is futile.

l.    The acts complained of constitute violations of the fiduciary duties owed by FoxHollow's officers and directors and these acts are incapable of ratification.

m.    The Compensation Committee of the Board determines, reviews and makes recommendations to the Board regarding the compensation policy for FoxHollow's officers and directors.    At the time of filing his original Complaint, the Compensation Committee was comprised of Defendants Hinohara and Child.    As Defendants Hinohara and Child control the other Defendants' compensation, the remaining members of the Board will not institute this against Defendants Hinohara and Child.    To do so would jeopardize each director's personal financial compensation.    Thus demand on Director Defendants Simpson, Fitch and Potter is futile.

n.    In addition, should the Director Defendants decide to bring claims against themselves, it would likely trigger an "insured vs. insured"

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-06-4908 JW RS                                                                        24

exclusion which is typical for D & O insurance policies, which would make D & O insurance coverage unavailable to them.

o. FoxHollow has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for FoxHollow any part of the damages FoxHollow suffered and will suffer thereby.

p. The actions of the directors have impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiffs' demands.

q. Any suit by the directors of FoxHollow to remedy these wrongs would likely expose the Director Defendants and FoxHollow to further violations of laws which could result in additional civil actions being filed against one or more of the Director Defendants thus they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves.

79.   Moreover, Plaintiffs have not made any demand on the shareholders of FoxHollow to institute this action since demand would be a futile and useless act for the following reasons:

a. FoxHollow is a publicly held company with approximately 24,916,717 shares outstanding, and thousands of shareholders;

b. Making demand on such a number of shareholders would be impossible for Plaintiffs, who have no way of finding out the names, addresses or phone numbers of all the shareholders; and

c. Making demand on all shareholders would force Plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

80.   FoxHollow has expended and will continue to expand significant sums of money as a result of the illegal and improper actions described above.   Such expenditures will include, but are not limited to costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts and the costs and expenses related to the securities class actions filed against the company.

### FIRST CAUSE OF ACTION

**Against Individual Defendants
for Breach of Fiduciary Duty**

81.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if set forth fully herein.

82.     The Individual Defendants owed and owe FoxHollow fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe FoxHollow the highest obligation of good faith, fair dealing, loyalty and due care.

83.     The Individual Defendants, each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

84.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition and business prospects of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

85.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, FoxHollow has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

86.     Plaintiffs, on behalf of FoxHollow, have no adequate remedy at law.

### SECOND CAUSE OF ACTION

**Against The Individual Defendants
for Abuse of Control**

87.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if set forth fully herein.

88.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability of control and influence FoxHollow, for which they are legally responsible.

89.    As a direct and proximate result of the Individual Defendants' abuse of control, FoxHollow has sustained significant damages.

90.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

91.    Plaintiffs, on behalf of FoxHollow have no adequate remedy at law.

### THIRD CAUSE OF ACTION

**Against the Individual Defendants
for Gross Mismanagement**

92.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if set forth fully herein.

93.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of FoxHollow in a manner consistent with the operations of a publicly held corporation.

94.    As direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, FoxHollow has sustained significant damages in excess of millions of dollars.

95.    Plaintiffs, on behalf on FoxHollow, have no adequate remedy at law.

### FOURTH CAUSE OF ACTION

**Against the Individual Defendants
for Waste of Corporate Assets**

96.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if set forth fully herein.

97.    As result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to

conduct proper supervision, Individual Defendants have caused FoxHollow to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

98.   As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

99.   Plaintiffs, on behalf of FoxHollow, have no adequate remedy at law.

**FIFTH CAUSE OF ACTION**

**Against the Individual Defendants
for Unjust Enrichment**

100.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if set forth fully herein.

101.   By his wrongful acts and omission, the Individual Director Defendant was unjustly enriched at the expense of and to the detriment of FoxHollow.

102.   Plaintiffs, as shareholders and representatives of FoxHollow, seek restitution from the Individual Defendant, and seek an order from this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and fiduciary breaches.

**SIXTH CAUSE OF ACTION**

**Against the Insider Selling Defendants for Violation
Of California Corporation Code §25402**

103.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

104.   At the time that the Insider Selling Defendants sold their shares of the Company's common stock as set forth herein, by reason of their high executive and/or directorial positions with the Company, the Insider Selling Defendants had access to highly material information regarding the Company, including the information set forth

herein regarding the true adverse facts of the Company's option backdating, improper accounting, and false financial statements.

105. At the time of such sales, that information was not generally available to the public or the securities markets. Had such information been generally available, it would have significantly reduced the market price of the Company's shares at that time.

106. Each of the Insider Selling Defendants had actual knowledge of material, adverse non-public information regarding the Company, and thus sold their shares of the Company's common stock in California in violation of California Corporations Code §25402.

107. Pursuant to California Corporations Code §25502.5, each of the Insider Selling Defendants are liable to the Company for damages in an amount up to three times the difference between the price at which the stock was sold by these Insider Selling Defendants, and each of them, and the market value which the stock would have had at the time of the sale if the information known to these defendants had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

## SEVENTH CAUSE OF ACTION

### Against the Director Defendants for Violations of California Corporations Code §25403

108. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

109. The Director Defendants, through their positions, possessed control and influence over the Insider Selling Defendants' sale of FoxHollow common stock in violation of the California Corporations Code. The Director Defendants are statutorily liable to the same extent as the Insider Selling Defendants under California Corporations Code §25403.

110.   The Director Defendants are aware of the Insider Selling Defendants' knowledge of the material, adverse, non-public information and of the Insider Selling Defendants' intent to sell FoxHollow common stock while in possession of the material, adverse, non-public information.

111.   The Director Defendants are culpable for the Insider Selling Defendants' underlying violations of the California Corporations Code §25403 because of their knowledge and ability to control and influence the Insider Selling Defendants and because their involvement in preparing and/or approving financial reports that improperly accounted for the Company's compensation expenses related to grants of stock options to FoxHollow officers, directors and employees.

112.   Under the California Corporations Code §25403, the Director Defendants, and each of them, are liable to FoxHollow for damages in an amount up to three times the difference between the price at which FoxHollow common stock was sold by the Insider Selling Defendants, and each of them, and the market value which that FoxHollow common stock would have had at the time of the sale if the information known to the Individual Defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.   Against the Individual and Director Defendants in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.   Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of

1   the Individual Defendants' trading activities or their other assets so as to ensure that

2   Plaintiffs have an effective remedy;

3       C.      Awarding to FoxHollow restitution from the Individual Defendants, and

4   each of them, and ordering disgorgement of all profits, benefits and other

5   compensation obtained by these Defendants;

6       D.      Awarding to Plaintiffs the costs and disbursements of the action,

7   including reasonable attorney's fees, accountants' and experts' fees, costs, and

8   expenses; and

9       E.      Granting such other and further relief as the Court deems just and

10  proper.

## JURY TRIAL DEMANDED

12      Plaintiffs hereby demand a trial by jury.

14  DATED: January 5, 2007            Respectfully submitted,

16                                    **GREEN WELLING LLP**

17                                    By: _____/s/_____
18                                            Robert S. Green

19                                    595 Market Street, Suite 2750
20                                    San Francisco, CA 94105
                                      Telephone: (415) 477-6700
                                      Facsimile: (415) 477-6710

21                                    William B. Federman
22                                    **FEDERMAN & SHERWOOD**
                                      120 North Robinson, Suite 2720
23                                    Oklahoma City, OK 73102
                                      Telephone: (405) 235-1560
24                                    Facsimile:  (405) 239-2112

25                                    *Attorneys for Plaintiffs*

26

27

28

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. C-06-4908 JW RS                                           31

## VERIFICATION

I, Andrew I. Smith, declare that I have reviewed the Verified Amended Shareholder Complaint ("Complaint") prepared on behalf of FoxHollow Technologies, Inc., and I authorize its filing. I have reviewed the allegations made in the Verified Amended Shareholder Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of FoxHollow Technologies, Inc. common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

_____
Date

_____
Andrew I. Smith